IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 3, 2023

## MORRIEO ALLEN v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 15-04011      Chris Craft, Judge
_____

**No. W2023-00592-CCA-R3-PC**
_____

The petitioner, Morrieo Allen, appeals the denial of his petition for post-conviction relief, arguing the post-conviction court erred in finding he received the effective assistance of counsel at trial. Following our review, we affirm the denial of the petition.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and ROBERT H. MONTGOMERY, JR., J., joined.

Shae Atkinson, Memphis, Tennessee, for the appellant, Morrieo Allen.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Steve Mulroy, District Attorney General; and Sam Winnig, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Facts and Procedural History*

The petitioner was convicted of first-degree murder during the perpetration of a robbery and sentenced to life imprisonment. This Court affirmed the trial court's decision on direct appeal, and the Tennessee Supreme Court denied the petitioner's application for permission to appeal. *State v. Allen*, No. W2018-01339-CCA-R3-CD, 2020 WL 883126 (Tenn. Crim. App., Feb. 21, 2020), *perm. app. denied* (Tenn. July 23, 2020). The petitioner's conviction stems from his robbery and murder of Cleate Davis in December 2014. From this Court's opinion on direct appeal, we discern that the petitioner's girlfriend, Alesha Cox, had arranged with the victim via text message to meet with the

victim and provide prostitution services. *Id.* at *1. The petitioner discovered the text messages and angrily confronted Ms. Cox, who explained she was going to provide prostitution services in order to have money to buy Christmas presents for her children. *Id.* The petitioner offered to go to the meeting with Ms. Cox and "scare" the victim into giving her money without having to engage in sexual acts. *Id.* The next day, the petitioner and Ms. Cox drove to a church to meet the victim. *Id.* Ms. Cox stayed in the car while the petitioner hid behind the church. *Id.* When the victim arrived, the petitioner shot him and took his cellphone, wallet, and cash. *Id.* The petitioner then drove the victim's vehicle to another location and later set it (with the victim's body inside) on fire to destroy evidence of the crime. *Id.* at *1-*2.

On December 13, 2018, the petitioner filed a petition for post-conviction relief, and the post-conviction court entered an order staying the petition until the petitioner had exhausted all of his remedies on appeal.[1] On August 11, 2020, the post-conviction court appointed counsel to represent the petitioner, and appointed counsel filed an amended petition on January 31, 2022. Various allegations were raised in the petitions, including the two ineffective assistance of counsel claims pursued on appeal: counsel never gave the petitioner a complete discovery packet of his case causing him to be "largely unaware of the strength of the prosecution's case," and the petitioner's lead attorney did not inform the petitioner that another attorney would represent him at trial and the petitioner "never discussed his case with [the other attorney]."

The post-conviction court conducted an evidentiary hearing on September 9, 2022, at which both lead counsel and co-counsel testified, as well as the petitioner.

Lead counsel, an attorney with twenty-eight years' experience in the public defender's office and currently in a supervisory role, testified that she was assigned to the petitioner's case after the State indicated it would not pursue the death penalty and the capital case unit would no longer handle the case. Lead counsel understood that she was chosen to handle the case because "it was a really bad case violence wise" and that the office believed she might be successful in negotiating a plea in which the petitioner could avoid a life sentence. Once it appeared the case would not be settled and would proceed to trial, lead counsel selected co-counsel to assist because their office required a second chair on murder cases, and she "thought he would be a good co-counsel."

Lead counsel reviewed the discovery and gave the petitioner a full copy of the discovery she received from the State. She said she typically discussed the discovery with her client after they had a chance to review it, and she recalled doing that in this case although they did not go over it "page-by-page." She explained that she and the petitioner

---

[1] The petitioner's direct appeal was pending when he filed his petition for post-conviction relief.

also had a general conversation about the witnesses and reviewed some pictures. She did not remember if there was video evidence but there were "graphic photos from the crime scene." Lead counsel recalled that the discovery was "voluminous," including thirteen to fourteen witness statements in what was described as a "stack" of "a couple hundred pages." In her review of the discovery with the petitioner, lead counsel focused on the witnesses who would be presented at trial "unless there was something helpful or exculpatory in some of the others." Lead counsel stated that they discussed the evidence against the petitioner and answered any questions the petitioner had regarding the evidence. She reiterated that she provided the petitioner with a copy of the discovery the State had provided her.

Lead counsel described her practice of meeting with her clients to get their side of the story and then she keeps them apprised as she works on the case. She usually meets with her clients more as the case moves closer to trial, and then right before trial she sits down with them and goes over everything again. Lead counsel gave the petitioner a breakdown of the State's proof and how it was going to present the evidence. She explained to the petitioner what a trial entailed "down to the basic form," including jury selection. Lead counsel also discussed the elements the State would have to prove in order for the petitioner to be found guilty.

Lead counsel recalled that the main witness against the petitioner was his "codefendant girlfriend," Ms. Cox, and lead counsel knew all along that Ms. Cox would testify. Lead counsel learned at trial around the midpoint of the case that Cameron Wesley, a cellmate of the petitioner's, was going to testify against the petitioner. Lead counsel and the petitioner also discussed the other corroborating evidence linking the petitioner to the crime.

Lead counsel recalled that the petitioner repeatedly asked her to get him a plea deal for twenty years, which she told him would not happen. Close to trial, the petitioner agreed for lead counsel to take a twenty-five year offer to the State, and the State countered with a twenty-eight-year offer. The petitioner refused. The morning of trial, the State agreed to twenty-five years, but the petitioner rejected that offer. Lead counsel said the petitioner was upset that Ms. Cox was getting a better deal and testifying against him. In an effort to persuade the petitioner, lead counsel showed him a photograph of "the victim burned up" and said "this is why we're here, you're the one that pulled the trigger and are accused of burning up the body. . . . [S]he's not the one that pulled the trigger." However, the petitioner did not want to take the offer. Lead counsel said the petitioner was aware of the evidence against him prior to making the decision to accept or reject any offer formally conveyed to him by the State, and she "still do[es]n't understand why we couldn't settle it on a 25."

- 3 -

Lead counsel stated that she introduced co-counsel to the petitioner about a month or two before trial and explained that he would be assisting her. The attorneys originally planned for co-counsel to handle voir dire and then "split up" the other parts of trial. However, lead counsel chose to have co-counsel handle more of the trial because "the jury really seemed to like him and he was communicating well with them . . . he seemed to just have a good rapport with the jury[.]" Lead counsel said that she might have handled a few witnesses, but co-counsel "did a lot more of it than [she] did." Lead counsel said the defense strategy was to exclude "as many graphic pictures as possible," and "cross-examine or pick apart each piece of evidence the State had against him and try to create some reasonable doubt[.]"

Co-counsel testified that his primary area of practice was criminal law from 2008 until 2022, which included working at the public defender's office from 2015 to 2019. During his time at the public defender's office, co-counsel assisted in the representation of the petitioner. Co-counsel explained that lead counsel had been assigned to the petitioner's case for some time, and co-counsel was asked to assist after it was set for trial. He started looking at the case a few months before trial, which involved reviewing all of the discovery. Co-counsel recalled that the discovery was "pretty voluminous" and included a number of video and audio statements.

Co-counsel stated that he did not personally sit down and review the discovery with the petitioner, as that would have already been done by lead counsel. He also did not have an independent recollection of meeting with the petitioner prior to trial but said that he "might have seen him once or twice." Co-counsel said that any investigation would have been done prior to his involvement.

Co-counsel believed an offer of twenty-five years was made close to the start of trial and "some of the lawyers involved thought it was resolved, but when it came time to enter the plea and finalize it in court . . . it fell apart." Co-counsel said, however, that lead counsel's recollection would be better as she was the one who handled the plea negotiations. Co-counsel did not recall personally having a conversation with the petitioner regarding whether to plead guilty, go to trial, or what his exposure would be if convicted after a trial. Co-counsel did not have an independent recollection of discussing the elements the State would have to prove at trial but "assume[d]" that he did because he communicated with the petitioner while the trial was going on.

With regard to defense strategy, co-counsel recalled that the main evidence against the petitioner was from the petitioner's co-defendant's girlfriend and co-counsel focused his time on preparing his cross-examination of her. Co-counsel was aware that Mr. Wesley, the petitioner's cellmate, had given a statement and was a potential witness for the State, but it was unknown going into trial whether the State knew where Mr. Wesley was located

- 4 -

and if he would testify. Co-counsel did not know whether the petitioner was aware that Mr. Wesley would possibly testify because that was something that would have presumably been reviewed before co-counsel's involvement.

The petitioner testified that lead counsel provided him discovery but that it "was incomplete." He did not realize he had received incomplete discovery until he received all of the documents from post-conviction counsel. When asked what was missing, the petitioner said he did not receive everything that was in the stack of papers lead counsel identified earlier in the hearing. The discovery provided to him did not include any crime scene photographs or autopsy reports, and there were statements he was not aware even existed. The petitioner brought it to lead counsel's attention that the discovery did not appear to be complete, and lead counsel promised to get it for him but never did. The petitioner claimed that lead counsel did not really review the discovery that was given to him, elaborating, "[W]hen I spoke to her, she basically was just waiting on me to tell her something and it's not my job to tell you. You supposed to tell me." The petitioner said that both of his attorneys lied when they testified about meeting with him, looking at the discovery, and preparing for trial.

The petitioner admitted that he was aware of the State's allegations against him and that he had an opportunity to speak to lead counsel about "what really happened." However, he "really didn't talk to her because [he] didn't trust her from the beginning." He felt that lead counsel had just taken the case to take it and "had no enthusiasm." He met co-counsel one time about a month prior to trial. The meeting was an initial introduction that lasted five minutes and the only thing communicated was that co-counsel was going to assist lead counsel at trial.

The petitioner denied ever indicating to lead counsel he wanted an offer of twenty years, elaborating, "[W]hy am I asking for a 20 and I ain't done nothing wrong?" However, he later admitted he was "[o]f course" interested in an offer because he was facing being incarcerated for the rest of his life. The petitioner recalled that the first offer lead counsel conveyed to him was an offer of forty-five years made several months before trial, which he would not take. The petitioner denied signing paperwork for twenty-five years for counsel to present to the State, claiming it was for twenty-seven years. He said it was never communicated to him that the State would not accept twenty-seven years but would accept twenty-eight years. He also claimed it was never communicated to him on the day of trial that the State was willing to accept twenty-five years. The petitioner said he would have accepted an offer of twenty-five years, but he was not interested in twenty-seven. He reiterated that the only offer ever communicated to him was for forty-five years.

When asked if his attorneys explained what would happen at trial, the petitioner responded, "Kind of. Yeah and no." He elaborated that it was explained to him that he

- 5 -

could possibly get life in prison if he went to trial and might get out faster if he accepted a plea. However, he did not know much about the State's evidence. He was only told on the day of trial who would be testifying, but he was not told what all of the witnesses would say. He assumed leading up to trial that Ms. Cox was going to testify, but he did not learn that Mr. Wesley might testify until the day of trial. The petitioner said he did not know what his defense was going to be and when he asked that question of counsel, he received a "[b]lank face" as a response.

The petitioner claimed that had he known all the evidence the State had against him, he would have accepted an offer. Specifically, he said that had he seen the crime scene photographs, autopsy photographs, photographs of the deceased victim, medical examiners report, and the missing witness statements, he would have accepted a plea. However, per the petitioner, he did not see that evidence until his trial.

Throughout the hearing, the petitioner maintained he did not shoot the victim nor did he burn the victim's body. The petitioner said that Ms. Cox's testimony was not true and that the person who identified him near the burning truck was "mistaken." The petitioner also claimed to have nothing to do with the victim's cellphone being at the petitioner's cousin's house after the petitioner had been at his cousin's house. The petitioner acknowledged having testified at the hearing that he did not want an offer because he "didn't do anything wrong" but said "[i]t would have been nice" to have one.

On December 19, 2022, the post-conviction court entered an order denying the petition. The petitioner filed an untimely appeal, but the untimely filing was waived in the interest of justice.

*Analysis*

On appeal, the petitioner argues he received ineffective assistance of counsel because (1) counsel failed to disclose and review all of the State's proof with him prior to trial and (2) his co-counsel assumed a primary role at trial. The State responds that the record supports the post-conviction court's denial of relief because the petitioner failed to prove he received ineffective assistance. We agree with the State.

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff*

*v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo,* affording a presumption of correctness only to the post-conviction court's findings of fact. *Id*.; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id*. Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*.; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

## I.      Discovery

The petitioner argues he received ineffective assistance of counsel because his attorneys did not discuss and review with him all of the State's proof prior to trial, asserting there were many witness statements and photographs he did not see prior to trial nor did he know Cameron Wesley was going to testify against him until the trial. He claims that he would have taken the State's plea offer had he known the full extent of the proof against him. The State submits that "the record supports the post-conviction's denial of post-conviction relief as [the] petitioner failed to prove that his trial attorneys provided ineffective assistance." Upon our review, we agree with the State.

At the evidentiary hearing, the petitioner testified that lead counsel provided him with discovery but that it "was incomplete." He claimed he did not become aware of certain things until trial or when they were provided to him by post-conviction counsel. Among the items the petitioner claimed not to have received were crime scene photographs, autopsy reports, and a "stack" of witness statements. Notably, the petitioner introduced as an exhibit at the evidentiary hearing more than 150 pages of discovery that he claimed to have not been provided, which included the statement of Ms. Cox, his co-defendant and main witness against him. The petitioner also claimed he did not learn Mr. Wesley was going to testify against him until the trial.

Lead counsel testified that she gave the petitioner a full copy of the discovery she received from the State. After the petitioner had a chance to review it, she went through the information with him. Although they did not go through the "voluminous" number of documents "page-by-page," they had a conversation about the witnesses, reviewed pictures, and "talked a lot about the different proof against him." Lead counsel learned Mr. Wesley was going to testify for the State sometime around the midpoint of the case. Lead counsel stated that the petitioner was aware of the evidence against him before making the decision to accept or reject the State's offer, specifically including the testimony of Ms. Cox, Mr. Wesley, the eyewitness at the scene, and the identification of the vehicle that tied him to the crime.

The post-conviction court found the petitioner's testimony was not credible. Specifically, the court stated:

> [T]his court finds it incredible that [the petitioner's] trial attorney would not furnish him with Ms. Cox's statements to the police, his co-defendant and the main witness against him at trial, and that he would not realize it until shown them by his post-conviction attorney years after the trial. If [the petitioner] was not given any photos, and none of the 13 witness statements contained in Exhibit A [submitted as an exhibit at the evidentiary hearing],

there would have been nothing left for him to have received, and so he would have received no discovery at all.

The post-conviction court found lead counsel's testimony that she gave the petitioner copies of her "open file" discovery, went over the witness statements with him, and particularly discussed "the testimony of Ms. Cox and the cell-mate to whom he confessed" to be "very credible." The court concluded that "no deficient performance [was] proven as to this allegation as the petitioner's testimony is simply not credible."

The petitioner and lead counsel provided conflicting testimony, and the post-conviction court clearly resolved the credibility determination in favor of lead counsel. "[Q]uestions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456. The record supports the court's determination that the petitioner has failed to prove that counsel rendered deficient performance. Accordingly, the petitioner is not entitled to relief.

## II.     Co-Counsel

The petitioner also asserts he received ineffective assistance of counsel because lead counsel primarily represented him prior to trial and then co-counsel assumed a greater role in conducting the trial. In support of his claim that co-counsel should not have handled such a large portion of his trial, the petitioner points to co-counsel's testimony that he did not personally review discovery with the petitioner, conduct any investigation, discuss the State's likely proof at trial with the petitioner, or assist the petitioner with weighing the options between pleading guilty and going to trial because lead counsel did those things prior to co-counsel's involvement. Additionally, the petitioner submits that it was error for co-counsel to handle a significant portion of his trial when he and co-counsel "were so unfamiliar with each other," and the deficient performance "actually had an adverse effect on the defense."

At the evidentiary hearing, lead counsel testified that once it appeared the case would not be settled and would proceed to trial, she selected co-counsel to assist because their office required a second chair on murder cases, and she "thought he would be a good co-counsel." Lead counsel introduced co-counsel to the petitioner about a month or two before trial and explained that co-counsel would be assisting her. The attorneys originally planned for co-counsel to handle voir dire and then "split up" the other parts of trial. However, lead counsel made the strategic decision to have co-counsel handle more of the trial because "the jury really seemed to like him and he was communicating well with them . . . he seemed to just have a good rapport with the jury[.]" Lead counsel said that she might have handled a few witnesses, but co-counsel "did a lot more of it than [she] did."

Co-counsel testified to his preparation for the petitioner's case, including reviewing the "voluminous" amount of discovery and spending a great deal of time preparing for cross-examination of the main witness against the petitioner, Ms. Cox. The petitioner testified that he met co-counsel one time about a month prior to trial. The meeting was an initial introduction that lasted five minutes and the only thing communicated was that co-counsel was going to assist lead counsel at trial.

With regard to this issue, the post-conviction court recounted lead counsel's and co-counsel's extensive experience in criminal defense and lead counsel's reasons for allowing co-counsel to take a more prominent role at trial. The court then found that "[n]o proof ha[d] been offered as to any prejudice the petitioner suffered from having an extra attorney represent him on his case, and no strategic error or mistake has been shown caused by [co-counsel]'s not coming on board sooner than 2 or 3 months prior to trial."

The record supports the post-conviction court's determination that the petitioner failed to establish how he was prejudiced by co-counsel's taking a lead role at trial. Co-counsel was a seasoned attorney in the public defender's office, responsible for handling serious felony cases, and he had developed a good rapport with the jury. The petitioner did not point to any lack of preparation or error on the part of co-counsel or offer any reason why co-counsel's taking a primary role prejudiced him or changed the outcome of the case.

In support of his argument, the petitioner points to this Court's decision in *Merriweather v. State*, No. W2018-01373-CCA-R3-PC, 2019 WL 4257010 (Tenn. Crim. App. Sept. 6, 2019), in which a panel of this Court determined that the petitioner received ineffective assistance of counsel where the petitioner was not informed another attorney was joining the defense team and would be lead attorney at trial. *Id.* at *9. One of this Court's primary concerns in *Merriweather* was that "the divided labors between attorneys created gaps in performance." *Id.* However, *Merriweather* is readily distinguishable from the case at hand.

In *Merriweather*, pertinent information regarding the petitioner's mental health history was given to the original attorney but not relayed to the new attorney, demonstrating the new attorney "was not completely familiar with the petitioner's case." *Id.* In addition to the new attorney's lack of awareness of the petitioner's mental health history, the new attorney also wrongly advised the petitioner that a co-defendant had implicated him and would testify against him at trial. *Id.* In the present case, co-counsel did not make blatant misstatements of the evidence or express unawareness concerning crucial history related to the petitioner. Additionally, the new attorney in *Merriweather* had only been practicing law for six months and had "sat second chair . . . on one trial[] but he had never cross-examined a witness." *Id.* at *1. Co-counsel in the present case was a seasoned criminal defense lawyer who was familiar with handling serious felony cases. The lack of

communication in *Merriweather* led the petitioner to enter what this Court concluded was an unknowing and involuntary guilty plea. *Id.* at *10. Whereas, here, the petitioner has not pointed to how co-counsel's taking a more primary role actually had an adverse effect on his defense.

The petitioner has failed to demonstrate prejudice and is not entitled to relief.

### *Conclusion*

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE